UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION
3:09-cv-517-RJC-DCK

| | |
|---|---|
| ILONKA AYLWARD and VALENTINA KRASNOVA,<br><br>   Plaintiff,<br><br>v.<br><br>FEDERAL EMERGENCY MANAGEMENT AGENCY,<br><br>   Defendant. | **MEMORANDUM OF DECISION, FINDINGS OF FACT, AND CONCLUSIONS OF LAW** |

**I. BACKGROUND**

This is a claim for flood insurance benefits arising out of Tropical Storm Fay in Charlotte, NC. The Plaintiffs, Ilonka Aylward and Valentina Krasnova, commenced this action against the Defendant, the Federal Emergency Management Agency (FEMA) on December 2, 2009. Plaintiffs alleged that FEMA breached the terms of their flood insurance policy by wrongfully refusing to pay the full amount due for covered losses. By order dated February 21, 2011, this Court granted Defendant's motion for summary judgment with respect to a second flood that had occurred on Plaintiffs' property and denied the motion with respect to the certain elements of the first flood. A bench trial was held on July 21, 2011, and the matter has now been fully submitted for decision.

Pursuant to Rule 52(a) of the Federal Rules of Civil Procedure, the Court hereby enters the following findings of fact and conclusions of law. The Plaintiffs are entitled to recover an additional $13,057.10 from FEMA for damage to their home that was directly caused by the August 27, 2008 flood.

## II. FINDINGS OF FACT

1. The Standard Flood Insurance Policy (SFIP), incorporated into the Federal regulations at 44 C.F.R. Part 61, App. A(1) (2008), is applicable to the flood claims in this case.

2. The SFIP limits coverage to "direct physical loss by or from flood" and contains a long list of losses that are not covered. It also enumerates several preconditions to collecting on a claim, including the filing of a proper "proof of loss" within 60 days of the flood loss.

3. A proof of loss is "the [insured's] statement of the amount [the insured] is claiming under the policy, signed and sworn to by [the insured.]" 44 C.F.R. Pt. 61, App. A(1), Art. VII(J)(4). A proof of loss must provide, *inter alia*, a brief explanation of how the loss occurred, detailed repair estimates, and an inventory of damaged property. Although policyholders may be provided with the services of an adjuster in completing their proofs of loss, the SFIP expressly declares that "this is a matter of courtesy only," and that the insured bears the ultimate responsibility for complying with the terms and conditions of the SFIP. Id. Policyholders are also required to "cooperate with the adjuster or representative in the investigation of the claim." 44 C.F.R. Part 61, App. A(1), Art. VII, J,6.

4. Payment on an SFIP claim constitutes a direct charge on the United States Treasury. 42 U.S.C. §§ 4017-18; Battle v. Seibels Bruce Ins. Co., 288 F.3d 596, 600 (4th Cir.2002).

5. Prior to 2008, FEMA issued to Plaintiffs SFIP No. RL00036051 for flood insurance coverage under the National Flood Insurance Program (NFIP) for the Plaintiffs' single-family residence located at 1645 Scotland Avenue in Charlotte, North Carolina.

6. The Plaintiffs purchased building coverage on the insured property for up to $250,000 with a $500.00 deductible. The Plaintiffs did not purchase contents coverage. The Plaintiffs

renewed their policy annually, and the policy was in full force and effect on August 27, 2008, the date of the flood at issue in this litigation.

7.      On August 27, 2008, Briar Creek, which runs through the plaintiffs' neighborhood, overflowed due to heavy rains from Tropical Storm Fay. On August 28, 2008, FEMA received Plaintiffs' Notice of Loss for this flood and opened a claim file.

8.      Thereafter, FEMA assigned the claim for investigation to an independent adjusting company, Jackson Adjustment Company (Jackson).

9.      Jackson's adjuster, Steven Taylor, inspected the Plaintiffs' covered residence on August 31, 2008. Mr. Taylor determined from his inspection that the flood waters rose to thirty eight (38) inches inside the lowest level of the Plaintiffs' home and remained for 1.5 days before receding. Mr. Taylor prepared and signed a Proof of Loss (POL) recommending payment for drywall above four feet and stored building materials, among other things.

10.     As an advance payment for anticipated flood damage covered by the policy, on September 8, 2008, FEMA issued a check to the Plaintiffs and their mortgage company in the amount of $10,000. That check was endorsed by the Plaintiffs and their mortgage company.[1]

11.     On October 17, 2008 the Plaintiffs signed and notarized a POL based on an initial repair estimate prepared by the Jackson adjuster which estimated the "full cost of repair or replacement" of the covered flood damage to be $84,529.87.

12.     On November 3, 2008, Jackson prepared a revised POL with a new "full cost of repair or replacement" estimate of $76,102.27. This was $8,427.60 less than the amount set forth in the October 17, 2008 POL because the revised estimate deducted the cost of drywall above four

---

[1] The policy requires claim payments to be made jointly to insureds and any mortgagee on the property. 44 C.F.R. Part 61, App. A(1), Art. VII, Q; Exhibit 1, p. 23.

feet ($6,627.60) and the portion of the construction materials stored in the detached garage that were to be used for the garage itself ($1,800 of the $3,000 total claimed). Mr. Taylor testified that he thought there was eight feet of damage, but once he finished the claim and submitted it to Jackson for approval, he was advised to reduce the claim to four feet of damage. This reduction occurred without anyone else from Jackson visiting the premises. See Tr. Trans. II at 105.[2] The Plaintiffs did not sign the revised POL.

13. Kevin Trent, President of Trent Builders and a licensed contractor in Charlotte, NC for over 25 years, reviewed the November 3, 2008 POL and gave his expert opinion at trial on whether the repair estimate quoted in the revised POL was within the range of available prices in the Charlotte construction market. See Tr. Trans. III at 3-5, 8. At trial, Mr. Trent credibly testified that within his experience, the listed repairs in the revised POL could "definitely" be accomplished in the Charlotte market for the prices quoted in that report, especially given the additional $14,440 FEMA paid the Plaintiffs. Id. at 9; see Doc. No. 17-28: Declaration of Kevin Trent ("In my professional and personal opinion, $90,032.27[3] is more than sufficient to complete the work described in the building estimate considering the prices for labor and material available in the Charlotte, NC area during the relevant time period, and would in fact allow for additional repairs or renovations not included in that estimate").

14. On or about November 4, 2008, FEMA received from the Jackson adjuster a Flood Damage Closing Report containing a description of the repairs to be made, photographs of the

---

[2] All page numbers in the Draft trial transcript are subject to change.

[3] FEMA's total payment to Plaintiffs, $90,537.62, was $505.35 more than the figure that Mr. Trent concluded would be sufficient to complete all repairs.

4

property, the October 17, 2008 POL signed by the Plaintiffs, and the revised unsigned POL. FEMA waived the SFIP's 60-day deadline for the POLs submitted on November 4, 2008.

15. By letter dated December 4, 2008, NFIP Claims Examiner Derek Stone informed the Plaintiffs of FEMA's decision on their POLs submitted on November 4, 2008. (Doc. No. 17-18). In this letter, Stone explained that FEMA had determined that it could not extend payment under the policy for any damages above the four-foot water line given that the interior water line was measured at 38 inches (i.e., 3.2 feet) and remained for only 1 day and 12 hours. He also informed the plaintiffs that the policy did not cover repairs to the detached garage because it "has areas that are used or held for residential purposes," so the garage required a separate flood policy. Def.'s Ex. 23 at 1. This letter further informed the Plaintiffs that the POL would be accepted in the amount set out in the revised repair estimate submitted by adjuster Taylor, less the $500.00 policy deductible and the $7,676.44 of recoverable depreciation that would be paid separately. This amounted to $67,925.83.

16. Thereafter, on November 25, 2008, FEMA issued a second check to the Plaintiffs and their mortgage company in the amount of $57,925.83, which, together with the $10,000.00 advance check previously paid to the Plaintiffs, totaled $67,925.83. On December 16, 2008, FEMA issued a third check to the Plaintiffs and their mortgage company in the amount of $7,676.44 for the previously subtracted depreciation, which was actually recoverable under the terms of the Plaintiffs' particular policy. Those checks were endorsed by the Plaintiffs and their mortgage company.

17. On January 14, 2009, the Plaintiffs appealed Mr. Stone's December 4, 2008 decision and submitted with that appeal another POL for the 2008 flood, dated January 13, 2009. In this submission, the Plaintiffs sought $199,951.10, less a $500.00 deductible ($199,451.10). FEMA

considered this appeal and the January 13, 2009 POL, even though the January 13, 2009 POL was submitted two-and-a-half months after the sixty-day deadline set forth in the SFIP for submitting POLs.

18.     The Plaintiffs provided two calculations with the January 13, 2009 POL. The first was a bill from Servpro of South Charlotte to Ms. Aylward for post-flood cleaning services, showing a balance due of $26,464.86 (total of $26,964.86 less the $500 Plaintiffs already paid). The second was a repair estimate prepared by the Andrew Roby Company in the amount of $173,486.27. The total of these two figures is $199,951.13, which is within three cents of the total claim amount on the January 13, 2009 POL.

19.     With the January 13, 2009 POL, the Plaintiffs also submitted an engineering report prepared by Matthys N. Barker, PE of Sustainable Engineering and Efficient Designs, PLLC.[4] Mr. Barker stated that "no significant movements in the foundation were found," except for a crack in the basement slab; however, upon investigation, Barker found that "the majority of the settlement in the slab had occurred previously." Upon inspection of the interior of the house he found "no evidence of any major movements," and "only minor cosmetic damage." As to three minor cracks found in the exterior stucco finish of the house, Barker concluded that "[n]one of these cracks requires foundational stabilization and can be repaired cosmetically." He closed by stating, "Overall, there does not appear to be any significant settlements in the house foundation as a result of the flooding," and that "[f]ortunately, the stresses in this case only caused the minor cosmetic damage, as noted previously." Pls.' Ex. 3; Def.'s Ex. 25. The other engineer to evaluate the property at FEMA's request, Robert Nolan (who performed a site

---

[4] The parties stipulated that the reports of engineers Matthys N. Barker and Robert Nolan would be admissible in this case. (Doc. No. 7).

study after the second flood), found "no structural damage to the walls" and determined that the crack and drop in the floor "were present prior to the flood. There is no evidence of further damage to the basement slab in the flood." (Doc. No. 17-27 at 23). Nolan also concluded that the "foundation walls were not damaged due to velocity flow or settlement caused by the flood. The hairline cracks observed in the foundation walls are the result of long term settlement and/or shrinkage." Id. at 25.

20. Because the Plaintiffs' January 13, 2009 submission contained both an additional POL and an appeal, the documents were reviewed separately by the NFIP's claims department and FEMA's claims director (respectively).

21. On January 20, 2009, NFIP Claims Director Scott Holmes sent the Plaintiffs a letter explaining why the bill from Servpro, the company that provided post-flood clean up services, would not be paid in full. By Order entered February 22, 2011 this Court granted the Defendant's motion for summary judgment in part and disallowed the Plaintiffs' claim for any additional payments based on the Servpro bill.

22. On March 20, 2009, NFIP Claims Examiner Derek Stone issued an intermediary decision on the Plaintiffs' January 13, 2009 POL, pending further justification from the Plaintiffs. In this letter, Mr. Stone informed the Plaintiffs that the Andrew Roby Company estimate submitted with the January 13, 2009 POL included several items that were expressly excluded under the policy. These excluded items included 1) Demolition ($3,800) because the drywall had already been removed by ServPro, and if there was any rot, it would have been visible from the inside after the drywall was removed, so it was not necessary to also remove the stucco from the outside. See Def's Ex. 24; Tr. Trans. III at 38. Moreover, "rot is a process that occurs over a period of time" and not "direct damage from this flood event." Def's Ex. 24

at 1; 2) Framing ($7,820.54), insofar as additional removal or replacement of interior wall framing, on top of the adjuster's estimate, would be done to accommodate the re-leveling of the concrete slab floor because it was not "direct physical loss by or from flood"; 3) Garage Repairs ($6,429.50) because the detached garage "is not covered under this Dwelling policy, Article II.A.3, as it contains residential areas"; 4) Exterior Finishing ($4,812.00) because Article IV.9 of the flood policy "only covers your building and things inside your building."[5] Def's Ex. 24 at 2; 5) Structural Repairs ($15,141.23) and Floor Leveling ($1,950.00) because there was no direct physical damage by flood to any of the structural members of the building or to the concrete slab floor. Id.; and 5) Exterior Stucco ($12,600) because "any staining of the stucco's top coat could be remedied by cleaning-and-refinishing," which the adjuster provided for, and inspection for long-term rot could be conducted from the interior of the house. Id.

23. Stone's March 20, 2009 letter also told the plaintiffs that, unlike the adjustment company's estimate, the Roby estimate did not provide sufficient information to substantiate payment on several items. "[W]e tried to review the contractor's estimate," Stone explained, but it was "extremely difficult" to determine covered and non-covered damages without knowing "individual unit prices that the contractor is proposing." Def's Ex. 24 at 1. Throughout the letter, Stone reiterated that FEMA needed more information about the Roby estimate. For example, he asked Plaintiffs to "[p]lease review" the estimate and "let us know if your contractor can provide additional information to assist us with review of your claim." Id. After analyzing several insufficiently detailed areas of Plaintiffs' estimate, Stone stated, "As we've tried to outline for you, we do not have enough information on much of your

---

[5] This Court granted Defendant's summary judgment motion with respect to all of Plaintiffs' claims for exterior patio repairs, totaling $8,572.00. (Doc. No. 31).

contractor's pricing and estimate for us to determine if we might owe additional claim payment to you," and asked Plaintiffs to "[p]lease send us paid receipts and/or invoices for materials if you feel that the prices on materials are insufficient to make like-kind and quantity repairs." Id. at 3.

24. Similarly, NFIP Claims Director Scott Holmes sent Aylward an email on March 25, 2009, as a follow up to the March 20, 2009 letter, which had been prepared under Holmes's supervision. See Tr. Trans. III at 30. Holmes testified that he had worked "very, very closely" with Stone in reviewing Plaintiffs' claim and the Roby estimate. Id. at 36. In his email, Holmes told Plaintiffs that "it was difficult to try to compare pricing between the adjuster's estimate and your contractor's estimate" because the Roby estimate was not broken down by unit pricing, but "we tried as best we could with the information we received." Def.'s Ex. 22 at 1. Holmes notes that the March 20, 2009 letter (which he attached) included "specific questions that we'd like your contractor to answer so that we can further analyze your claim." Holmes concludes by saying, "I hope that . . . the explanations and requests contained in the letter help you see where we are with your claim, and where we can go in order to completely resolve this flood claim to your satisfaction or understanding." Id. Holmes credibly testified that if the plaintiffs had provided additional details as requested by the March 20, 2009 letter, he would have conducted a review with his examiner to determine if the additional information helps to "identify anything that the adjuster may have missed," both in terms of scope and price, and ultimately "we would have been able to make additional payment." Tr. Trans. III at 49. This Court finds that at this stage, FEMA's investigation of Plaintiffs' claim was still ongoing based on the March 20, 2009 letter, March 25, 2009 email, and the trial testimony.

9

25. The specific areas where FEMA told Plaintiffs that more information would be required to support any further payments with regard to the Roby estimate included: 1) Painting ($26,112.00) because this "outrageously high" estimate "includes a price for painting of about $4,900, based upon a square-foot price. Without knowing on what the painting contractor bases an estimate more than 5-times higher than an itemized estimate, the flood policy will not permit us to accept that price." Id at 2; 2) HVAC (no price quoted); because here, Plaintiffs had not provided any detail, and the adjuster's estimate already included repairs to the air conditioning units damaged by the flood, so FEMA told plaintiffs that there would be no coverage for additional HVAC work as nothing else was damaged by the flood. Id.; 3) Interior Finishing ($45,768.50) because FEMA could not determine "how much of the single charge for 'Interior Finishing' is for drywall, how much for closet shelf systems, how much for 'upstairs' work." Id. at 1. Moreover, "without the contractor letting us know of the unit prices that he's figuring on the millwork and on the drywall replacement, or for the ceramic tile work that he's bidding to perform, we're unable to determine if his charges are for like kind and quality materials, which is what the flood insurance policy covers." Id. Stone also reminded Plaintiffs that FEMA had determined that the flood policy did not cover the upper four feet of drywall and insulation or the ceiling drywall and/or insulation, and noted that this was not reflected in the estimate; 4) Plumbing ($3,910.00) because "[w]ithout detail as to exactly what the plumber is bidding, this charge seems very high." Id.; 5) Miscellaneous Job costs ($1,600) because these expenses appear to be a percentage of the total job, and "the scope of covered flood damage is only a small portion of the [Roby] estimate," FEMA's determination of how much these costs could be covered would depend on the final determination as to the other items in the estimate.

26. Although the plaintiffs submitted numerous documents during the course of this investigation, they failed to provide the additional information requested by Mr. Stone's March 20, 2009 letter or Mr. Holmes' March 25, 2009 email prior to filing this lawsuit.

27. In the March 20, 2009 letter, Stone also authorized an additional payment of $14,430.00 to the Plaintiffs as allowances for several specific repairs. This consisted of $750.00 for a permit; an additional $5,195.00 for millwork; an additional $800.00 for cabinetry; an additional $250.00 for a countertop; $150.00 for cabinet pulls; an additional $1,800.00 for like-kind-and-quality windows; $2,750.00 for additional work on the stairs; and a 20% allowance for the contractor's overhead and profit. On the same date as this letter, FEMA issued to the Plaintiffs and their mortgage company a check in the amount of $14,430.00. That check was endorsed by the Plaintiffs and their mortgage company.

28. The total amount FEMA paid to the Plaintiffs for the 2008 flood loss was $90,537.62.

29. On May 4, 2009, FEMA Director of Claims James A. Sadler, the person within FEMA responsible for reviewing appeals of denied flood claims, sent Plaintiff Aylward a letter acknowledging receipt of her appeal of the denial of payment for flood damage to her detached garage. Mr. Sadler informed Aylward that he had requested information regarding her case and would notify her in writing after conducting a review of the record.

30. On July 29, 2009, Sadler sent another letter to Aylward advising that he had reviewed the treatment of her claim, including adjustments and corrections that had been made during the claims process, and determined that the claim was correctly handled by the claim department. The letter also stated that "no further administrative review will be provided," and referred Aylward to the section of Plaintiffs' flood policy governing suits against FEMA. Def's Ex. 29. At this stage, and no earlier, FEMA's investigation of Plaintiffs' claims concluded.

31. On December 2, 2009, the Plaintiffs timely filed this lawsuit.

### III. CONCLUSIONS OF LAW

#### 1. FEMA's National Flood Insurance Program (NFIP)

The federally-subsidized NFIP makes affordable flood insurance available to the general public at or below actuarial rates. See 42 U.S.C. §§ 4001 et seq. FEMA controls the program, and the director of FEMA functions as its sole administrator. See 15 U.S.C. § 2201; Battle, 288 F.3d at 599. Accordingly, FEMA is authorized to promulgate regulations as to "the general terms and conditions of insurability which shall be applicable to properties eligible for flood insurance coverage," and as to "the general method or methods by which proved and approved claims for losses under such policies may be adjusted and paid." See Battle, 288 F.3d at 596, 599 (citing 42 U.S.C. §§ 4013, 4019). In other words, FEMA writes the policies and makes the rules as to claims made under those policies. Moffett v. Computer Sciences Corp., 457 F.Supp.2d 571, 573 (D.Md. 2006).

Compliance with the provisions of the SFIP is a condition precedent to recovery under the policy. Significant among these provisions are the following:

> Within sixty days after the loss, send us a proof of loss, which is your statement as to the amount you are claiming under the policy signed and sworn to by you, and which furnishes [the insurer] with the following information:
> * * *
> Specifications of damaged buildings and ***detailed repair estimates***;

44 C.F.R. Part 61, App. A(1), Art. VII, J,4,f (emphasis added).

> In completing the proof of loss, ***you must*** use your own judgment concerning the amount of loss and ***justify that amount***.

44 C.F.R. Part 61, App. A(1), Art. VII, J,5 (emphasis added).

> ***You must cooperate*** with the adjuster or representative in the investigation of the claim.

44 C.F.R. Part 61, App. A(1), Art. VII, J,6; Exhibit 1, p. 21 (emphasis added).

> We may request, in writing, that you furnish us with a complete inventory of the lost, damaged, or destroyed property, including;
> a.   ***Quantities and cost***;
> b.   ***Actual cash values or replacement cost*** (whichever is appropriate);
> c.   Amounts of loss claimed;
> d.   Any written plans and ***specifications for repair*** of the damaged property that you can reasonably make available to us.

44 C.F.R. Part 61, App. A(1), Art. VII, K, 2 (emphasis added).

Further, on covered items, the policy will pay to replace damaged items with "materials of like kind and quality and for like use." 44 C.F.R. Part 61, App. A(1), Art. VII, V,2,a. No provision of the policy, including the requirement for filing a proof of loss, may be changed or waived without "the express written consent of the Federal Insurance Administrator." 44 C.F.R. Part 61, App. A(1), Art. VII, D.

### 2. <u>Claim Amounts Under Review</u>

The SFIP and case law make clear that an insured is limited to the amount set forth in a timely POL and may not, after the 60-day period, submit additional claims for amounts or for work not properly set forth in the timely POL. See 44 C.F.R. Part 61, App. A(1), Art. VII, J, 4. For the August 27, 2008 flood, the last POL provided to FEMA was the POL (signed January 13, 2009) seeking $199,951.00 (less a $500 policy deductible) received by FEMA on January 14, 2009. FEMA has not waived the 60-day period for filing POLs for the 2008 flood loss beyond the January 14, 2009 submission date of the Plaintiffs' appeal. Accordingly, claims for the 2008 flood are limited to the amounts and repairs properly described, detailed, and justified in the POL received by FEMA on January 14, 2009, and allowed by the terms of the policy. Plaintiffs are not permitted to submit, and FEMA is not required to consider or pay, additional claims that were identified, created, or justified after January 14, 2009.

### A. <u>The First and Second Proofs of Loss</u>

As noted above, FEMA paid the amounts set forth in the second POL, which was the same as the first POL except that it deducted $6,627.60 for estimated drywall repairs above four feet and $1,800.00 for part of the construction materials stored in the garage.

### i) Drywall Repairs Above Four Feet

FEMA was not justified in deducting the cost of drywall replacement above four feet based on the fact that the flood waters reached only 38 inches. The evidence at trial established that there was substantial damage above the water line due to the flood. Specifically, Servpro's Water Damage and Equipment Monitoring Report noted that the "ceiling was falling," " mold was visible," and the "floor joists [are] showing dark spots," which could have been mold. Joint Ex. 20-1. James Pruitt, an employee of Servpro who worked at Plaintiffs' residence after the flood, testified at his deposition that in three or four rooms, there was "visible molding already," which could have been "from the water wicking." Joint Ex. 20 at 36. Although Pruitt stated that the drywall did not have to be removed based on the humidity level reading alone, it was hard to tell how far the humidity had wicked, and Plaintiffs had "a legitimate concern" that mold could be growing. Id. at 65. Additionally, Mr. Taylor testified that he believed his original proof of loss allowing claims for eight feet of damage to the drywall had been correct, but that he was told to decrease the claim to four-feet by his boss at Jackson Adjustment Company when he submitted his report for approval. See Tr. Trans. II at 100, 105. Mr. Holmes conceded at trial that he did not visit the premises and that "we knew that a part of the ceiling was wet, and part of the ceiling may have been falling." Holmes explained that he just was not sure that this damage was caused by the flood. However, he did not offer any alternative explanation for why parts of the ceiling would have been wet and falling right after the flood hit the property, and this Court finds that it was caused by the flood. Ms. Aylward, in her capacity as a witness, credibly

testified that the property did not "smell very good," the water had "seeped" up the walls, "[p]arts of the ceiling was falling," the tile was "cracking under the foot," the sheetrock and wood were "saturated," and there was some mold growing in spots on the first floor level.[6] Tr. Trans. I at 99-100.

This evidence established that drywall above four feet was falling and contained mold. Consequently, FEMA incorrectly determined that drywall above four feet was not justified under the policy and should not be reimbursed. This appears to be an absolute policy of FEMA's when flood water is in a house for a brief period of time, see, e.g., Def's Ex. 30 at 38; Tr. Trans. II at 108, and not a fact-based determination as required by the SFIP. Plaintiffs are therefore entitled to recoup the $6,627.60 for estimated drywall repairs above four feet that was deducted from the first, signed POL.

    ii)  Construction Materials Stored in Garage

As to the construction materials stored in the garage, FEMA allowed a partial $1,200.00 reimbursement but denied the $1,800.00 amount claimed above on the grounds that some of the materials were for the excluded detached garage. Because, as held below, the detached garage was covered by the SFIP, FEMA was not justified in deducting the cost of the materials that were for that structure. However, the Plaintiffs are not entitled to recoup the $1,800 because the evidence at trial established that the excluded construction materials were not properly secured, in violation of the SFIP. See Pl's Ex. 88; SFIP III(5)(B)(1) ("Personal property in a building that is not fully enclosed must be secured to prevent flotation out of the building. If the personal

---

[6] The Court characterizes this snippet of testimony as credible without condoning the various antics engaged in by Ms. Aylward as a lawyer/witness, which included evasive and non-responsive testimony, sarcastic questioning, and non-compliance and unfamiliarity with rules of procedure and evidence. It is understandable to the Court why opposing counsel frequently appeared perplexed in his dealings with Ms. Aylward. But perplexity with opposing parties is not grounds for denial under the SFIP

property does float out during a flood, it will be conclusively presumed that it was not reasonably secured. In that case there is no coverage for such property").

  B. The Third Proof of Loss

Other than the Servpro bill, which has been dismissed by this court in its summary judgment Order (Doc. No. 31), the third POL consisted of a repair estimate prepared by Brian Storm of the Andrew Roby Company and totaling $173,486.27. Except for the amount claimed for garage repairs, FEMA properly denied the unpaid claims in this estimate.

    i) Garage Repairs

FEMA determined that the $6,429.50 claimed for garage repairs are excluded by the SFIP. The policy excludes detached garages "used or held for use for residential (i.e., dwelling) . . . purposes," 44 C.F.R. Part 61, App. A(1), Art. III(A)(3), and FEMA argues that Plaintiffs' garage was "held for use" for residential purposes. In support, FEMA points out that the garage is a detached unit with an upper level that contains finished rooms, including a bathroom, kitchen, and living room. See Doc. No. 17-15 at 1, 31-35: Flood Damage Closing Report; Doc. No. 35: Defendant's Proposed Findings. FEMA has also submitted property record cards establishing that the Charlotte-Mecklenburg Tax Assessor's Office classified Plaintiffs' detached garage as a residential structure in the years 2008-2010. Def's Ex. 1. At trial, however, FEMA acknowledged that the meaning of "held for use" has not been litigated, making it a matter of first impression for this Court. See Tr. Trans. I at 23.

The plaintiffs did not use the detached garage for residential purposes but only used it for the conventional purposes of storing some construction materials and their car. This Court finds that the garage was also not "held for use" for residential purposes. Contrary to FEMA's March 20, 2009 letter to Plaintiff, which stated that the detached garage was excluded from coverage

16

because it "contains residential areas," the term "held for use" for residential purposes means something different. As this Court stated at Summary Judgment, the word "hold" has been interpreted to mean "possession or ownership." (Doc. No. 31). The phrase "held for use" is thus construed as referring, with regard to a detached garage, to a policyholder who possesses or owns a detached garage for residential purposes. At the time of the flood, the Plaintiffs' detached garage was in their possession, but it could not serve residential purposes: while the Plaintiffs may have intended to eventually turn the second story of the garage into a residential facility, testimony at trial established that the water and sewage lines had not been connected to the garage apartment at the time of the flood, and the heating and cooling was not working. See Trial Trans. I at 15; II at 43, 111; III at 83; Doc. No. 17-23 at 2 (letter from Aylward to FEMA); Pl's Ex. 25 (4/29/2009 check from Plaintiffs to connect sewer and water for garage). Without water and sewage connections, facilities such as the bathroom and kitchen lacked the present potential for residential use when the flood occurred. Consequently, FEMA improperly denied Plaintiffs' claim for damages regarding the garage. This conclusion is supported by the FEMA Adjusters Claims Manual, 2004 Revision p. V-11, which focuses on how a garage is being used at the time of the flood, stating that "if any part of the garage is used for anything other than storage or parking, coverage for the garage is nullified."

        ii)      <u>Claims that were Properly Denied</u>

The plaintiffs did not provide sufficient detail and/or justification on the rest of their claims and thus failed to comply with the requirements of the SFIP on these claims. The SFIP expressly states that "[y]ou may not sue us to recover money under this policy unless you have complied with all the requirements of the policy." 44 C.F.R. Part 61, App. A(1), Art. VII, R. As discussed above, Mr. Stone and Mr. Holmes clearly requested additional information or

justification from the plaintiffs regarding certain claims, and Plaintiffs failed to respond to these requests before filing suit. Ms. Aylward's response throughout these proceedings – that the reason she did not respond to FEMA's requests for more information was because FEMA did not appear open to discussion on the water line issue, or alternatively, that she did not respond because FEMA had the Andrew Roby Company's phone number – simply did not absolve Plaintiffs of their duty to cooperate under the SFIP.

$45,768.50 interior finishing: As found by Mr. Stone in his March 20, 2009 letter, this item failed to break out unit prices, so that it was impossible to determine if like kind and quality materials were being used as required by the policy. Consequently, this estimation was not detailed or justified as required by the policy.

$15,141.23 for structural repairs and $1,950.00 for floor leveling: Both engineers hired by the parties found no structural damage as a result of the floods, and both found that the floor was cracked before the floods. Thus, these claims were not justified as required by the policy.

$26,112.00 for painting: The estimate contains no description of area to be painted, no detail, and no justification for this amount of painting. Accordingly, this claim was not detailed or justified as required by the policy. FEMA allowed $5,881.91 for painting based on detailed square footage estimates by Mr. Taylor. Any amount claimed for painting in excess of the $5,881.91 amount allowed by FEMA was unjustified and properly denied by FEMA.

$8,382.00 for unspecified electrical work, including $1,000.00 for fixtures: In violation of the policy requirements for specific details and justification, this quote provides no description of the electrical work to be performed. As to the $1,000 allowance for electrical fixtures, there is no evidence that any electrical fixtures were located below the 38 inch flood line or were directly damaged by the flood. FEMA allowed $2,982.65 for electrical repairs

based on detailed specifications by Mr. Taylor.  Accordingly, any amount claimed for electrical repair in excess of the $2,982.65 amount allowed by FEMA were properly denied by FEMA.

$3,910.00 for unspecified plumbing work: In violation of the policy requirements for specific details and justification, this quote provides no description of the plumbing work to be performed, with the exception of an $850.00 fixture allowance.  FEMA allowed $2,266.17 for plumbing repairs based on detailed specifications by Mr. Taylor.  Accordingly, any amount claimed for plumbing repair in excess of the $2,266.17 amount allowed by FEMA was properly denied by FEMA.

$3,800.00 for demolition and $7,820.54 for framing and replacing wooden studs: The policy pays only for direct damage caused by flood.  44 C.F.R. Part 61, App. A(1), Art. V, A.  As stated by Mr. Stone in his March 20, 2009 letter, wood rot is a process that occurs over time and is not a direct flood loss.  Accordingly, removal and replacement of wooden studs and framing was not covered by the policy.  Although rot removal was not included in the Roby estimate, this Court is persuaded by Mr. Holmes's testimony that the only reason to do the additional framing work and replace the wooden studs in this case was because of rot.  See Tr. Trans. III at 74-5.  Additionally, as noted by Mr. Stone, the Servpro contractor had already performed demolition of the flooded area and charged for such demolition in the Servpro bill.  The additional charges in the Roby estimate would have been to improve the condition of the floor prior to renovating the house, and thus are not allowed.  See Tr. Trans. III at 39.

$12,600.00 for exterior stucco: As found by Mr. Stone in his March 20, 2009 letter, there is no evidence of direct flood damage to the exterior stucco walls.  As discussed above, rot within the walls is not a direct flood loss under the policy and any flood stains could be treated

by pressure washing without replacing the stucco. The Plaintiffs' own engineer concluded that minor cracks in the exterior stucco could be repaired cosmetically.

$1,800 for miscellaneous job costs: Mr. Stone stated that because the scope of covered flood damage was only a portion of the scope of the Roby estimate, the flood policy could only cover a "small portion of these job costs." Plaintiff failed to provide any additional support for these miscellaneous job costs, so this claim is not properly detailed or justified under the policy.

## IV. CONCLUSION

For the foregoing reasons, this Court concludes that FEMA is obligated under the SFIP to pay the plaintiffs an additional $13,057.10 (which is comprised of $6,429.50 for garage repairs and $6,627.60 for the cost of drywall above four feet) for damage to their house that was directly caused by the flood.

Signed: October 10, 2011

Robert J. Conrad, Jr.
Chief United States District Judge